BRAUN v. NEW YORK CENT. & H. R. R. CO

(Supreme Court, Trial Term, Monroe County. March 31, 1909.)

1. MASTER AND SERVANT (§ 286*)—MASTER'S LIABILITY FOR INJURIES TO SERVANT—ACTIONS—QUESTIONS FOR JURY.

Where it did not appear that the jerk which threw plaintiff's intestate from a car was greater than that ordinarily produced when a stop signal is given and the uncoupling mechanism fails to work, which not infrequently occurs, or that the practice of giving a stop signal in place of a slow-up signal had been found dangerous, or had previously produced such accidents, or that other roads had such a rule, plaintiff was not entitled to go to the jury on the question whether defendant was negligent in failing to adopt a rule against stop signals.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1036–1038; Dec. Dig. § 286.*]

2. NEW TRIAL (§ 41*)—EXCLUSION OF EVIDENCE—HARMLESS ERROR.

Exclusion of evidence, though error, is not ground for new trial after a nonsuit, where its admission would not have entitled plaintiff to go to the jury.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. § 69; Dec. Dig. § 41.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action by Mary Braun, as administratrix, against the New York Central & Hudson River Railroad Company. Motion by plaintiff upon the minutes of the court to set aside a nonsuit and for a new trial, on exceptions and grounds permitted by Code Civ. Proc. § 999. Denied.

Edward C. Edelman, for the motion.
Harris, Havens, Beach & Harris, opposed.

FOOTE, J. The complaint alleged that the plaintiff's intestate, who was a brakeman working in the defendant's freight yard at East Rochester, was killed on January 6, 1904, by being jerked or precipitated from the car to the track and run over, while he and the crew of which he was a member were engaged in making up a train of empty freight cars. The negligence alleged is a defective coupling appliance and the failure to make and enforce a rule requiring:

"That in the work of uncoupling cars from a train or engine for the purpose of shifting or shunting them to a certain place, no signal to stop or kick said train shall be given until said car shall have been uncoupled from said train, and that in case such cars cannot be uncoupled, because of the failure on the part of the coupling appliance to work, no such signal shall be given at all."

No proof was given of any defective coupling, and at the close of the plaintiff's case the only ground of negligence relied upon by the plaintiff was the failure of the defendant to adopt the rule alleged in the complaint. It was not claimed that plaintiff's intestate was an inexperienced brakeman, or unfamiliar with the practice of shifting and kicking cars in this yard, or that any similar rule was in force on this or any other railroad.

At the time of the accident this crew were engaged in shifting empty freight cars, for the purpose of making up a train of empty cars to be drawn out of the yard for delivery to another connecting road, which owned the cars. The engine was attached to a string of 17 cars, and the immediate operation in which they were then engaged was to place the rear 7, which were gondola coal cars, upon track No. 4, and for that purpose they were backing in from another track through a switch onto track No. 4 and moving at the rate of 5 or 6 miles an hour. Deceased was riding standing on the rear platform of the rear gondola car, with a lantern in his left hand and with his right hand resting on the top of the back end of the car, which was about the height of his shoulder. His duty was to set the brake on this car when it had run to its proper stopping place on track 4. After the rear 7 cars had run past the point of the switch, the conductor gave the engineer a signal to stop, and immediately seized hold of a lever to uncouple the 7 gondola cars from the other cars. This lever is at the front corner of the car. Its office is to raise out of the automatic coupler the pin which serves to lock it when closed. The object of giving the stop signal to the engineer was to take out the slack between the cars, which would release the tension on the pin in the automatic coupler and permit the lever to raise it and open the coupling. The 7 cars so released were then to run on with the momentum they already had. For some

reason the lever on this occasion failed to raise the pin and the uncoupling was not made. The stopping of the engine produced a jerk upon the cars, and this jerk is alleged to have thrown deceased off on to the track, where 2 cars passed over him, causing his death.

The failure of the lever to raise the pin was not an infrequent occurrence. It happened, according to the experience of some of the witnesses, once out of every 10 or 15 times. Why it occurred on this occasion did not appear. The coupling apparatus was examined by two of the inspectors within an hour after the accident and found to be in good order. Deceased was riding with his hand on the end of the car when the car passed the point of the switch where he was last seen. Whether he continued his hand in this position, or whether he changed his position in any respect before the accident happened, does not appear, as no one observed him from that point.

This method of shunting cars by means of what is called a "kick" was the method commonly employed in this yard. It is criticised by the plaintiff on the ground that it necessarily produces a jerk of the cars which are to be uncoupled, if the uncoupling mechanism fails to work at the proper time. It is necessary that there should be a release of the tension on the pin in order to successfully raise it; hence the uncoupling can only be made when the pressure produced by either pulling or backing the train is released. This occurs shortly after the engine is stopped, and the practice is for the conductor or brakeman who is to make the uncoupling to give the engineer the signal to stop and about the same time seize hold of the lever and lift it up, and to hold it in this position until the slack occurs, when the tension on the pin is released, and it raises and permits the coupling to open. In view of the fact that uncoupling cannot always be successfully made in this way, the plaintiff contends that there should be a rule against stopping the engine until it is ascertained that raising the lever will release the pin and permit the coupling to open. One method suggested is that a slow-up signal should be given to the engineer, which would · result finally, but not so quickly as by the other method, in releasing the tension on the pin and permit the uncoupling to be made; but, in case the uncoupling was not successfully made, the jerk upon the train would be less than in case of a stop.

No evidence was given tending to show that this practice of giving a stop signal in place of a slow-up signal had been found to be dangerous, or had before produced such accidents as occurred in this case, and my impression of the case is that it comes within the rule laid down in the cases of Pearsall v. N. Y. C. & H. R. R. Co., 189 N. Y. 474, 82 N. E. 752; Morgan v. Hudson River Ore & Iron Co., 133 N. Y. 666, 31 N. E. 234; Berrigan v. N. Y. L. E. & W. R. R. Co., 131 N. Y. 582, 30 N. E. 57; Larow v. N. Y. L. E. & W. R. R. Co., 61 Hun, 11, 15 N. Y. Supp, 384; Wolfinger v. Brooklyn Heights R. R. Co., 121 App. Div. 140, 105 N. Y. Supp. 610. Within these authorities, I think the plaintiff failed to make a case for the jury on the question of fact as to whether such a rule as the plaintiff suggests is reasonably necessary for the safety of its brakemen, and that the cases cited by the plaintiff's counsel, relating to the propriety or necessity for rules to

protect persons working under standing cars or engines against such cars or engines being moved or run into while engaged in their work, do' not apply.

It' is manifest that the risk to brakemen upon freight trains arising from the jerking of a car is the same, whether engaged in switching in a yard or running on the road; that, if a rule is proper or necessary on that subject in respect to switching cars in the yard, it would be equally necessary elsewhere. Such a rule, to be effective, must be one to prevent the too sudden stopping or starting of cars. Whether the defendant or any other railroad company has a rule to prevent the jerking of cars does not appear. It is also manifest that whether the sudden stopping of an engine will produce a jerk of more or less violence upon the cars to which it is attached depends upon the rate of speed at which they are moving, and a rule in reference to the safety of brakemen, as to whether it shall be a stop signal or a slow-up signal, must take into account the rate of speed. But' occasions must be frequent when it is necessary to stop a train as quickly as possible, both going forward and backward; and how is it possible to form a workable rule that when a freight train is moving faster than a given rate of speed no stop order shall be given to the engineer until after he has received a slow-up order, and then to formulate the necessary exceptions to such rule?

In the present case it did not' appear that the jerk which threw the plaintiff's intestate off the car was greater than the usual or ordinary jerk connected with the starting and stopping of cars. The nature of the business is such that' it cannot be transacted without some jerking of the cars, and in the absence of evidence that the jerking involved in this switching process was greater or more dangerous than in other places I think the plaintiff was not entitled to go to the jury on the question whether there should not have been a special rule applicable to this particular branch of the work. Moreover, the conductor, or whoever is to raise the lever, must' run along with the cars holding up the lever until the necessary slack has been produced to release the pin. In the nighttime, in the winter, as was the case here, this would be done with considerable risk of stumbling and falling under the cars, and in case of such an accident it might well be claimed that the company should have anticipated such an accident and should not have made a rule against a stop signal, which, if used in place of a slow-up signal, would have required the conductor to run 'a shorter distance, and this would have lessened the danger to him.

I assume that the action is under the employer's liability act, and that the plaintiff's notice under the act was sufficient; but the act does not affect this question. The rule must be the same as if it' were a common-law action.

Attention· is called in the plaintiff's brief to a ruling excluding proof of the custom in another yard, and plaintiff cites the case of Freemont v. Boston & Maine R. R. Co., 111 App. Div. 831, 98 N. Y. Supp. 179, affirmed 187 N. Y. 571, 80 N. E. 1109, to show that the ruling was erroneous. Assuming the ruling to have been erroneous, I think it is ₋ot a ground for granting a new trial. It is not' claimed that any

rule existed in the yard in question, but the proof offered was to show that it was the practice in that yard to give the slow-up signal, rather than the stop signal, when kicking cars. The witness was allowed to state how he performed that work, but was not allowed to state the practice of others in that yard. I think, within the authorities above cited, the case would have been the same had this evidence been received, and that the plaintiff would not have been entitled to go to the jury on the question as to whether such a rule as plaintiff contends for should have been adopted by the defendant. There was, therefore, no evidence of defendant's negligence sufficient to submit to the jury.

It is proper to note that, while this cause was tried in December, 1907, the briefs on this motion were not submitted until the present month.

Plaintiff's motion to set aside the nonsuit and for a new trial must be denied.